UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

Ernest W. Vann,

                             Plaintiff,                         **Hon. Hugh B. Scott**

                                                           09CV385

                        v.                                   Report &
                                                          Recommendation

Fischer et al.,

                             Defendants.

_____

      The plaintiff, Ernest W. Vann ("Vann") commenced this action pursuant to 42 U.S.C. § 1983 alleging that his civil rights have been violated while incarcerated at the Wende Correctional Facility ("WCF"). Pending before the Court are the following motions: the plaintiff's motion "granting exhaustion of remedies" (Docket No. 7), the plaintiff's motion for injunctive relief (Docket No. 12), and the plaintiff's motion to compel discovery (Docket No. 21).[1]

**Background**

      Vann has enumerated 11 claims in this complaint. In his First Claim, Vann alleges that he has been denied the right to practice his Native American religion because he has been denied

---

[1] The discovery motion is the subject of a separate Decision & Order.

1

dance bells, and a ceremonial blanket used in connection with his religious worship. (Docket No. 1, pages 7- 10). Vann states that he submitted a grievance with respect to his request for dance bells and a ceremonial blanket and was advised that the ceremonial blanket would be purchased but that it was up to the individual to purchase dance bells, which would then be the subject of a security review. (Docket No. 1 at page 10). Similarly, in this Second Claim, Vann maintains that he was improperly asked to pay for a butane lighter to be used by the Native American Group[2] "to smudge with for their prayers." (Docket No. 1 at page 11). The plaintiff asserts that the delay in providing the butane lighter and the request that he pay for the lighter constitute intentional religious discrimination. (Docket No. 1 at page 15). Vann's Third Claim is based upon the fact that he was instructed to remove the "big" locker used by the Native American Group to store the items used in their religious ceremonies and put them in a smaller locker. Some of the larger items (i.e. a drum and a pipe) would not fit in the smaller locker and the defendants advised Vann that these items would have to be stored in a back room with items from other groups. Vann argues that this is a violation of his religious rights because the sacred drum and pipe was no longer protected. (Docket No. 1 at page 22). He claims that the treatment of these items constitutes "intentional desecration of Native American Indian religious artifacts." (Docket No. 1 at page 23). Vann also claims that the search of the big locker by corrections officials was improper. (Docket No. 1 at page 22). The Fourth Claim revolves around Vann's attempt to sell candy as a fund raiser for the Native American Group. He wanted to order a case of candy, and then sell the candy to inmates to raise funds. Instead, he was told he would have to

---

[2] Vann refers to the "Native American Group" in his complaint. It appears that this is comprised of a group of inmates who participate in Native American religious worship with the plaintiff.

pre-sell the candy before the case of candy was ordered. Vann suggests that other religious groups, such a Muslims, do not have to pre-sell candy for such fund raising efforts. (Docket No. 1 at page 24-26). The plaintiff acknowledges that he was advised that WCF had implemented a pre-sale procedure that applied to all inmate groups in fund raising activities. (Docket No. 1 at page 27). After being informed of this requirement, Vann states that he attempted to convert the Native American Group from a fund raising group to a "fulltime religious group." As the basis for his Fifth Claim, Vann asserts that the first form he submitted in this regard was lost and that he was "ignored every time [he] inquired about [the] application to return to a fulltime religious group. (Docket No. 1 at page 28). The plaintiff's Sixth Claim is that Deacon Gordon Steinagle, the Catholic Chaplain at WFC, "stole" money from the Native American account by ordering improper items (apparently without the permission of the Native American Group members). (Docket No. 1 at pages 29-32). As for his Seventh Claim, Van states that on or about July 11, 2008, he was informed that he was being removed as "facilitator" for the Native American Group at WCF. Vann claims that he was removed from the position of facilitator in retaliation for filing multiple grievances. (Docket No. 1 at page 33-34). Vann's Eighth Claim is that the defendants are not properly processing his grievances or allowing him to appeal his grievances. (Docket No. 1 at pages 36-40). The plaintiff's Ninth Claim is that his request for a special permit to have a shrine of all his religious items in his cell was denied, at least in part, because he is a Native American. (Docket No. 1 at page 41). His Tenth Claim is based upon the fact that he asserts that the "2009 Special Events Calendar" for WCF only properly listed 3 of the 10 days of observance and ceremonies celebrated by the Native American Group. (Docket No. 1 at pages 43-45). He also asserts that he did not receive a hearing relating to his grievance on this matter but was

"appealing to the next step." (Docket No. 12 at page 45). Finally, Vann asserts that he prepared a purchase request to obtain flour and oil to make fried bread for the Native American ceremonies, and that the purchase request was approved by Deacon Gordon Steinagle. (Docket No. 1 at page 46). It does not appear that Vann received the oil, inasmuch as Vann filed a grievance stating that he was being denied the right to purchase cooking oil from the commissary. (Docket No. 1 at page 46).

**Motion to Grant Exhaustion of Administrative Remedies**

The plaintiff has filed a motion seeking the Court to "grant exhaustion of administrative remedies." (Docket No. 7). This issue is more commonly before the Court as a result of a motion filed by the defendants to dismiss the complaint for failure to exhaust administrative remedies. The Prison Litigation Reform Act ("PLRA") provides that: "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). To satisfy the PLRA exhaustion requirement in this jurisdiction, an inmate must comply with DOCS' well-established, three-step IGP prior to filing his complaint. Verley v. Wright, 2007 WL 2822199, at *5-6 (S.D.N.Y. 2007). This process requires an aggrieved inmate to: (1) file a grievance with the Inmate Grievance Resolution Committee ("IGRC"), (2) appeal, if he disagrees with the IGRC's decision, to the superintendent of the facility, and (3) seek review of the superintendent's decision, if it is adverse, with the Central Office Review Committee ("CORC"). 7 N.Y.C.R.R. § 701.5; *see also* Espinal v. Goord, 558 F.3d 119, 125 (2d Cir.2009). The inmate must file his administrative

complaint within 21 days of the alleged grievance. 7 N.Y.C.R.R. § 701.5(a)(1). Costor v. Sanders, 2009 WL 1834374, at *3 (S.D.N.Y.,2009).

The defendants have ***not*** moved to dismiss the complaint based upon an assertion that the plaintiff failed to exhaust administrative remedies. The defendants have included an affirmative defense stating that the plaintiff has not exhausted administrative remedies. The plaintiff has set forth documents purporting to establish exhaustion of administrative remedies as to each of his claims. (Docket No. 8). It is not certain whether the documents presented by the plaintiff constitute a complete record of the administrative proceedings. The defendants have construed this motion as one seeking to strike their fourteenth affirmative defense (Docket No. 4 at ¶ 42) which asserts that the plaintiff has failed to exhaust his administrative remedies. (Docket No. 15 at n.1). In this regard, the defendants assert that motions to strike an affirmative defense under Rule 12(f) of the Federal Rules of Civil Procedure are not favored and may be granted only if the insufficiency is clearly apparent. Elliot v. City of New York, 2008 WL 4178187, at *15 (S.D.N.Y. 2008) (citing Landry v. Potter, 2005 WL 293500, at *1 (D.Conn. 2005)(Motions to strike affirmative defenses under "Rule 12(f) for legal insufficiency are generally disfavored and if there are questions of fact or disputed questions of law, the motion should be denied."). To prevail on this motion, the plaintiff must demonstrate that (1) there exists no question of fact upon which the defense could succeed, (2) there exists no question of law upon which the defense could succeed, and (3) Williams would be prejudiced by inclusion of the defense. Id. (citing S.E.C. v. KPMG, LLP, 2003 WL 21976733, at *2 (S.D.N.Y. 2003). Inasmuch as the defendants have not filed a motion seeking to dismiss the complaint based upon a failure to exhaust administrative remedies, the instant motion is premature. The defendants argue that

5

factual issues exist as to whether the plaintiff has exhausted his remedies but do not identify any specific issue. (Docket No. 15 at page 6). Notwithstanding, the defendants contend that this action is in its early stages and that no significant discovery has taken place. (Docket No. 15 at page 6). The Second Circuit has held that the determination of the sufficiency of an affirmative defense before any opportunity for significant discovery has been afforded is particularly inappropriate. Salcer v. Envicon Equities Corp., 744 F.2d 935, 939 (2d Cir.1984). Thus, to the extent that the motion is deemed a motion to dismiss the affirmative defense, it is recommended that the motion be denied without prejudice at this time.

**It should not be difficult for the defendants to determine whether the plaintiff has exhausted his remedies with respect to the claims in this case. The defendants are directed to assess whether the plaintiff has exhausted his administrative remedies as soon as possible. Any motion seeking to dismiss any of the claims as being unexhausted must be filed within 30 days of the date of this Order.**

**Motion for Injunctive Relief**

The plaintiff contends that on June 21, 2009, he asked to have access to the Native American Group locker but was denied because he was no longer the facilitator for the Native American Group. (Docket No. 12 at ¶¶4-5).[3] Vann seeks injunctive relief precluding the

---

[3] Vann contends that on June 15, 2009, he had an argument with Deacon Gordon Steinagle about the items Native Americans are allowed to have in their locker. (Docket No. 12 at ¶2). Vann also states that he was denied access to the locker on June 21, 2009 because Deacon Steinagle advised WCF staff not to allow the plaintiff access to the locker because he was not the Native American Group facilitator, (Docket No. 12 at ¶¶5-9). Steinagle testifies that he did not

defendant Gordon Steinagle from preventing him access to the Native American locker even though he is no longer the facilitator for the Native American Group (Docket No. 12 at ¶9). The plaintiff asserts that he must be allowed access to the Native American Group locker "to obtain sage, abalone shell and lighter to conduct" his prayer." (Docket No. 12 at ¶ 13). Attached to the plaintiff's motion papers is a memorandum from Karen Crowley, WCF Deputy Superintendent for Programs dated June 23, 2009 advising Vann that she was advising "the Officer and Area Sergeant that if there is no Chaplin in the area when the Native American services are being held, that one person from the Native American community will be allowed to get what is needed for the service/study group from the locker. The Officer will have to open the locker and insure everything is returned to the locker at the end of callout. In the near future, there should be a new inmate facilitator for the Native American Group. The facilitator will be responsible for getting the supplies out of the locker and returning them at the end of the group." (Docket No. 12 , Exhibit B).

In their response to the instant motion for injunctive relief, the defendants assert that the motion should be denied because "the plaintiff has not shown a likelihood of success on the merits or (ii) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor." (Docket No. 15 at page 2). The defendants further assert that "[e]ven assuming the plaintiff's allegations are true for purposes of this motion, he has alleged a small delay in getting items from a locker on

---

work at WCF on June 15, 2009, and that he did not argue with Vann on that date (or any other date) regarding the items to be placed in the Native American Group locker. (Docket No. 17 at ¶ 3). Further, Steinagel states that June 21, 2009 was a Sunday; that he does not work at WCF on Sundays and did not work there on June 21, 2009. (Docket No. 17 at ¶4).

7

6/21/09. This situation was immediately rectified as is evident from the Memorandum dated 6/23/09 from the Deputy Superintendent for Programs, Karen Crowley." (Docket No. 15 at page 3-4).

In reply to the defendants' responsive papers, Vann suggests that Steinagle has not produced payroll records which would reflect whether or not Steinagle worked on June 15, 2009. In addition, the plaintiff suggests that Steinagle could have been at the WCF as a volunteer on June 15, 2009. (Docket No. 19 at ¶10). The plaintiff's reply also alleges new claims which were not stated in either the complaint or the motion for injunctive relief. For example, Vann alleges that Crowley allowed, and even "ordered" inmates to "heist" things belonging to Vann from the Native American Group locker (Docket No. 19 at ¶¶ 7-9); Vann claim (apparently for the first time in this proceeding) that he is a Cherokee, and not a Mohawk, and that the defendants refuse to acknowledge his religion or provide him with a sacred Ark used in his Cherokee ceremonies or to allow him to celebrate on the "New Moon Cycle" used by Cherokees and not the "liturgical (Christian) dates" used by Mohawks and other nations of the Iroquois Confederacy. (Docket No. 19 at ¶¶ 14-22).[4] Vann also asserts that "[s]ince 1999, plaintiff has had no ceremonies, ceremonial items, dances, songs, language tapes, language books, spiritual literature, etc." (Docket No. 19 at ¶ 24).[5] Inasmuch as these newly asserted allegations are not contained in the

---

[4] This allegation appears to be inconsistent with the plaintiff's Tenth Claim in the Complaint in which he asserts that his religious rights were violated in that he requested a copy of the "Iroquois ceremonial cycle that begins on the New Moon each month" and that the defendants only listed three of the ten dates correctly on the Special Events Calendar (Docket No. 1 at page 43, ¶¶ 5-6).

[5] This allegation is controverted by the plaintiff's various allegations in the complaint as well as in other filings by the plaintiff in which Vann acknowledges that he has participated in various religious ceremonies and has been provided with various items to facilitate those

complaint, or in the instant motion for injunctive relief, the Court declines to consider them for the purpose of this motion.[6]

A preliminary injunction is an "extraordinary remedy that should not be granted as a routine matter." Patton v. Dole, 806 F.2d 24, 28 (2d Cir.1986). In most cases, the party seeking the injunction must show a threat of irreparable injury if the injunction is not granted and either (1) a probability of success on the merits or (2) sufficiently serious questions going to the merits of the claims to make them a fair ground of litigation, and a balance of hardships tipping decidedly in favor of the moving party. See Jolly v. Coughlin, 76 F.3d 468, 473 (2d Cir.1996) (internal quotes omitted). Where, however, a movant seeks relief which will alter, rather than maintain, the status quo, or which will provide him with substantially all the relief sought, the injunction sought is properly characterized as mandatory rather than prohibitory. A party seeking a mandatory injunction must make a "clear" or "substantial" showing of the likelihood of success, as well as irreparable harm should the injunction not be granted. See id. at 473-74. Here, the plaintiff seeks to change the status quo; that is, to require the defendants to allow him access to the Native American Group locker even though he is no longer the group facilitator. The Court treats the instant motions as seeking mandatory rather than prohibitory relief; accordingly, the plaintiff must make a clear or substantial showing of the likelihood of success.

---

ceremonies. Indeed, as described above, many of the allegations of the complaint revolve around Vann's desire to have one locker to store all the religious items and that he have access to that locker. (See Docket No. 1, Second, Third, Ninth Claims). Also, the exhibits attached to the plaintiff's reply reflect that he has had access to spiritual literature inasmuch as he has quoted from or attached excerpts of passages from various spiritual writings. (Docket No. 19, Exhibits J, K, L, M, N, O at page 8, O at page 9, O at page 11, O at page 12, O at page 13, O at page 15, O at page 16-18, O at page 19 - 20, O at page 21, O at page 22-24).

[6] The Court notes that the plaintiff has not sought to amend the complaint.

Irreparable Harm

"The showing of irreparable harm is the 'single most important prerequisite for the issuance of a preliminary injunction.' " Brown v. Middaugh, 1998 WL 566791, *1 (N.D.N.Y. 1998). Although "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," Elrod v. Burns, 427 U.S. 347, 373 (1976), irreparable harm has not been consistently presumed in cases involving allegations of the abridgement of First Amendment rights. See Amendola v. Town of Babylon, 251 F.3d 339, 343 (2d Cir.2001) (per curiam). However, in The Bronx Household of Faith v. Board of Education of the City of New York, 331 F.3d 342, 349 (2d Cir.2003), the Second Circuit ruled that where the alleged deprivation of the plaintiff's First Amendment rights resulted directly from the defendant's policy prohibiting religious services or instruction in school facilities, irreparable harm may be presumed. The Bronx Household of Faith, 331 F.3d. at 350.[7]

In the instant matter, because the plaintiff alleges that the defendants' conduct denied him his right to the free exercise of religion under the First Amendment irreparable harm may be presumed for the purposes of these motions.

Likelihood of Success on the Merits

The plaintiff must also demonstrate a likelihood of success on the merits. "Prisoners have long been understood to retain some measure of the constitutional protection afforded by the

---

[7] The Second Circuit further stated that a plaintiff must establish a causal link between the injunction sought and the injury alleged where the injury results from a rule or regulation that may only potentially affect speech. Id.

10

First Amendment's Free Exercise Clause." Ford v. McGinnis, 352 F.3d 582, 588 (2d Cir.2003) (citing Pell v. Procunier, 417 U.S. 817, 822 (1974)). However, because the religious rights of prisoners must be balanced against the interests inherent in prison administration, free exercise claims of prisoners are "judged under a 'reasonableness' test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." O'Lone v. Estate of Shabazz, 482 U.S. 342, 349 (1987); see also Salahuddin v. Goord, 467 F.3d 263, 274 (2d Cir.2006). Pursuant to this reasonableness test, "'when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests.'" O'Lone, 482 U.S. at 349. This test is less restrictive than the test ordinarily applied to non-prisoner free exercise claims because, as the Court recognized, "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." O'Lone, 482 U.S. at 348.

Assuming that the plaintiff's religious beliefs are sincere, [8] the plaintiff has not

---

[8] It is well established in this Circuit that a court's scrutiny of whether a plaintiff is entitled to free exercise protection "extends only to whether a claimant sincerely holds a particular belief and whether the belief is religious in nature." Jolly, 76 F.3d at 476. Sincerity analysis "seeks to determine an adherent's good faith in the expression of his religious belief." Patrick v. Lefevre, 745 F.2d 153, 157 (2d Cir.1984) (citing International Society for Krishna Consciousness v. Barber, 650 F .2d 430, 441 (2d Cir.1981)). In Patrick, the Second Circuit held that this "test provides a rational means of differentiating between those beliefs that are held as a matter of conscience and those that are animated by motives of deception and fraud. The latter variety, of course, must be subject to governmental invasion, lest our society abjure from distinguishing between the incantation of "sincerely held religious beliefs" as a talisman for self-indulgence or material gain and those beliefs genuinely dictated by conscience." Patrick, 745 F.2d. at 157. Such an analysis requires the factfinder to "delve into the claimant's most veiled motivations[.]" Id.. In evaluating whether an adherent's belief is religious in nature, courts have rejected an objective, content-based approach in favor of "a more subjective definition of religion, which examines an individual's inward attitudes towards a particular belief system." Id. The Second Circuit has quoted with approval the definition of religion articulated by the

11

established a likelihood of success on the merits under the Religious Land Use and Institutionalized Persons Act ("RLUIPA").[9] Even where an inmate holds a sincere belief that is religious in nature, his rights to free exercise of that religious belief are subject to restriction in the prison environment. "Balanced against the constitutional protections afforded prison inmates, including the right to free exercise of religion, are the interests of prison officials charged with complex duties arising from administration of the penal system." Ford, 352 F.3d 582, 588 (2d Cir.2003), quoting Benjamin v. Coughlin, 905 F.2d 571, 574 (2d Cir.1990). The Supreme Court has accorded great deference to the determinations of prison officials and fashioned "a lesser

---

American philosopher William James: "the feelings, acts, and experiences of individual men in their solitude, so far as they apprehend themselves to stand in relation to whatever they may consider the divine." Patrick, 745 F.2d at 158 (quoting W. James, The Varieties of Religious Experiences 31 (1910)). In the instant case, questions as to the sincerity of the plaintiff's beliefs may be raised inasmuch as the plaintiff did not identify himself as an adherent of the Cherokee religion in his complaint, but instead appeared to suggest that he followed the Iroquois ceremonial cycle. (Docket No. 1 at page 43). The record has not been fully developed as to this issue. Notwithstanding, inasmuch as the plaintiff cannot establish a likelihood of success on the merits, the Court need not make a finding as to the sincerity of the plaintiff's beliefs for purposes of resolving the instant motion.

[9] RLUIPA was enacted following the Supreme Court's invalidation of the Religious Freedom Restoration Act of 1993 ("RFRA") in City of Boerne v. Flores, 521 U.S. 507 (1997), on the grounds that it exceeded Congress's authority under the Fourteenth Amendment. See Marria v. Broaddus, 2003 WL 21782633, at *12 (S.D.N.Y. 2003); Fluellen v. Goord, 2007 WL 4560597, at *5 (W.D.N.Y. 2007) ("RLUIPA corrected the constitutional infirmity of RFRA by invoking federal authority under the Spending Clauses to reach any program or activity that receives federal financial assistance, thereby encompassing every state prison.") (citations omitted). The statute represents a renewed effort by Congress in the wake of City of Boerne to impose a "strict scrutiny" test in cases in which free exercise of religion is substantially burdened. See Madison v. Riter, 240 F.Supp.2d 566, 568-70 (W.D.Va.2003). Thus, Congress, in enacting both the RFRA and RLUIPA, sought to restore the "compelling interest/least restrictive means" standard that was previously enunciated by the Supreme Court in Sherbert v. Verner, 374 U.S. 398 (1963) but later abandoned in Employment Division v. Smith, 494 U.S. 872 (1990). See Muhammad v. City of New York Dep't of Corr., 904 F.Supp. 161, 187 (S.D.N.Y.1995).

standard of scrutiny ... in determining the constitutionality of the prison rules." Turner v. Safley, 482 U.S. 78, 81 (1987); O'Lone, 482 U.S. at 349. The standard is one of reasonableness, taking into account whether the particular regulation affecting some constitutional right asserted by a prisoner is "reasonably related to legitimate penological interests." Turner, 482 U.S. at 89; O'Lone, 482 U.S. at 349; Benjamin, 905 F.2d at 574. In Turner, the Supreme Court articulated four factors to be considered in determining whether a prison regulation is reasonably related to a legitimate penological interest: (1) whether there is a rational connection between the regulation and the penological interest asserted; (2) whether there are alternative means of exercising the right; (3) the impact that any accommodation of the right will have on guards, other inmates and prison resources in general; and (4) whether alternative methods for accommodating the right exist at *de minimis* cost to the penological interest asserted. Turner, 482 U.S. at 89-91. Moreover, once a legitimate penological interest has been put forward to justify an infringement upon a prisoner's religious free exercise, the prisoner bears the burden of showing that these concerns "were irrational." Fromer v. Scully, 874 F.2d 69, 74 (2d Cir.1989) (upholding prison regulation requiring that prisoners' beards be no longer than one inch in order to preclude weapons or contraband from being hidden therein).

In the instant motion for injunctive relief, the plaintiff contends that he was denied access to the Native American Group locker on June 21, 2009. It is not certain from the record whether this deprivation actually prevented the plaintiff from participating in any planned religious ceremony. It appears undisputed that the denial of access to the locker was isolated and did not constitute a continuing deprivation which substantially burdened the plaintiff's religious observances. It is reasonable for the WCF to designate certain individuals to access the Native

13

American Group locker to ensure the proper control and inventory of the items stored in the locker. The plaintiff has not demonstrated that this restriction substantially burdens his ability to practice his religion. The plaintiff has not demonstrated that he has a right to unrestricted access to the items in the Native American Group locker. The record reflects that Crowley took measures to ensure the plaintiff's access to the items in the locker when appropriate (through the Chaplin on duty, the area Sergeant)[10] shortly after the plaintiff reported the June 21, 2009 deprivation. (See June 23, 2009 Memo attached as Exhibit B to Docket No. 12). The Court notes that the plaintiff has not specified any further date on which he was prevented from obtaining items in the locker which precluded him from participating in a religious ceremony. The isolated deprivation alleged by the plaintiff does not constitute a substantial burden as to his ability to practice his religion. Dunlap v. Losey, 40 F. App'x 41, 43 (6th Cir. 2002)( "The temporary deprivation of his hardcover Bibles, which Dunlap might have remedied more quickly, while making the practice of his religion somewhat more difficult, did not coerce him into action contrary to his beliefs, and did not state a claim under the RLUIPA."); Greenberg v. Hill, 2009 WL 890521 at *8 (S.D.Ohio, 2009)(Isolated incidents do not rise to the level of constitutional violations under RLUIPA); Rapier v. Harris, 172 F.3d 999, 1006 n. 4 (7th Cir.1999) (concluding that "the unavailability of a non-pork tray for [plaintiff] at 3 meals out of 810 does not constitute more than a *de minimis* burden on [plaintiff's] free exercise of religion"); Smith v. Caruso, 2008 WL 126434 (E.D.Mich.,2008)(A rule or regulation that makes the practice of a prisoner's religion somewhat more difficult, but which has no tendency to coerce him into acting contrary to his

---

[10] Once appointed, the new Native American Group facilitator would also be available to obtain items from the locker for the plaintiff's use in religious ceremonies. (See June 23, 2009 Memo attached as Exhibit B to Docket No. 12).

14

religious beliefs does not constitute a substantial burden.).

For the reasons set forth above, the motion for injunctive relief should be denied.

**Conclusion**

Based on the above, it is recommended that to the plaintiff's motion to "grant exhaustion" (Docket No. 7) is a motion to strike the affirmative defense relating to the exhaustion of administrative remedies and should be denied without prejudice at this time. It is also recommended that the plaintiff's motion for injunctive relief (Docket No. 12) should be denied.

Pursuant to 28 U.S.C. §636(b)(1), it is hereby ordered that this Report & Recommendation be filed with the Clerk of the Court and that the Clerk shall send a copy of the Report & Recommendation to all parties.

**ANY OBJECTIONS to this Report & Recommendation must be filed with the Clerk of this Court within ten(10) days after receipt of a copy of this Report & Recommendation in accordance with 28 U.S.C. §636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, as well as W.D.N.Y. Local Rule 72(a)(3).**

**FAILURE TO FILE OBJECTIONS TO THIS REPORT & RECOMMENDATION WITHIN THE SPECIFIED TIME, OR TO REQUEST AN EXTENSION OF TIME TO FILE OBJECTIONS, WAIVES THE RIGHT TO APPEAL ANY SUBSEQUENT ORDER BY THE DISTRICT COURT ADOPTING THE RECOMMENDATIONS CONTAINED HEREIN.** Thomas v. Arn, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed2d 435 (1985); F.D.I.C. v. Hillcrest Associates, 66 F.3d 566 (2d. Cir. 1995); Wesolak v. Canadair Ltd., 838 F.2d 55 (2d Cir.

1988); see also 28 U.S.C. §636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, and W.D.N.Y. Local Rule 72(a)(3).

Please also note that the District Court, on *de novo* review, will ordinarily refuse to consider arguments, case law and/or evidentiary material which could have been, but was not, presented to the Magistrate Judge in the first instance. See <u>Patterson-Leitch Co. Inc. v. Massachusetts Municipal Wholesale Electric Co.</u>, 840 F.2d 985 (1st Cir. 1988).

Finally, the parties are reminded that, pursuant to W.D.N.Y. Local Rule 72.3(a)(3), "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 72.3(a)(3) may result in the District Court's refusal to consider the objection.**

So Ordered.

                                              */s/ Hugh B. Scott*
                                              United States Magistrate Judge
                                              Western District of New York

Buffalo, New York
January 28, 2010